1   **RICHARD MARK GARBER**
    **Attorney at Law Bar #102688**
2   **12652 Huston Street**
    **North Hollywood, CA 91607**
3   E-mail: rickgarber@sbcglobal.net
    (818) 762-8120 | FAX (818) 762-0574
4
    Attorney for Debtor
5

6

7

8
                        UNITED STATES BANKRUPTCY COURT
9                        CENTRAL DISTRICT OF CALIFORNIA

10  In Re:                              )   Chapter 13
                                        )
11                                      )   Case No.  1:17-bk-13413-VK
                                        )
12                                      )   **SUR-REPLY OF MARK EFREM ROSENBERG TO**
                                        )   **THE  RESPONSE  OF  TRINITY  FINANCIAL**
13  MARK EFREM ROSENBERG               )   **SERVICES IN SUPPORT OF ITS OBJECTION TO**
                                        )   **DEBTOR'S SECOND AMENDED PLAN**
14                                      )
                                        )
15                                      )   Date:   12/11/18
                                        )   Time:    9:30 a.m.
16  _____ Debtor _____ )   Ctrm:    301

17
        **TO ALL PARTIES IN INTEREST:**
18
        **COMES NOW MARK ROSENBERG** (hereinafter, "Debtor"), in his sur-reply to the
19
    Response of Trinity Financial Services ("Trinity) in support of Trinity's Objection to Debtor's
20
    Second Amended Plan.
21
    Dated: December 5, 2018
22
                                                    _____
23                                                  Richard Garber, Attorney for Debtor
24

25

26

27

28

                                        -1-

## MEMORANDUM OF POINTS & AUTHORITIES

1.    <u>Debtor's applicable 36-month minimum commitment period is based on Debtor's actual income he received for the six-month period immediately preceding the commencement of Debtor's bankruptcy case.</u>

Trinity has cited two non-persuasive, non-binding cases from another district to support the proposition that the calculation of the "current monthly income" or "CMI" should include both income actually received and income derived (i.e. earned) irrespective of when it is received.[1]

However, as admitted by Trinity, its cited case law authority is directly contradicted by a reported case in this district authorized by the Hon. Judge Thomas Donovan. In <u>In re Katz</u>, 451 B.R. 512 (Bkrtcy. C.D.Cal. 2011), Judge Donovan held that the CMI consists only of income actually received during the applicable six month period prior to the filing of bankruptcy, stating:

> "I conclude that CMI is the monthly average of the 6 months income that Katz received from all sources. I disagree with Katz' contention that the March and May 2010 bonuses should be excluded from his CMI calculation. I agree that the plain meaning of § 101(10A)(A) controls, but I differ from Katz in what the plain meaning is. Reduced here to its essentials, § 101(10A)(A) states unequivocally and unambiguously that "current monthly income" means the "average monthly income from all sources that the debtor receives ..., derived during the 6–month period ending on (i) the last day of the calendar month immediately preceding the date of the commencement of the case...." As such, I conclude from the statute that CMI consists of income received during the applicable CMI period, regardless of when it was earned or when Katz' services that led to the income were performed. The statute does not address or limit the CMI calculation in Katz' case to the time period in which Katz' services that led to the income may have been performed. Instead, the statute requires the court to include all of Katz' income from any "source" that he "received" in the applicable 6–month CMI period. There is nothing in the statute that limits the calculation to income received that resulted from services performed during the applicable CMI period. In the court's view, the statute also includes income "derived" during the applicable CMI period even if "earned" by debtor's services performed two quarters earlier. According to the Merriam–Webster online dictionary, "derive" is defined as "to take, receive, or obtain especially from a specified source." Whether income is included in CMI should be determined by when Katz received funds, not when the funds were earned. In light of the absence of controlling authority 9 on this issue, [451 B.R. 517] it is the court's interpretation that the term "derived" in § 101(10A) provides no additional limiting criterion in order for "income received" during the prescribed 6–month period to be included in the calculation of CMI. The court concludes that in this case, the two quarterly bonus payments that were received by Katz in the applicable 6–month period must be included in calculating Katz's CMI. Including the first two quarterly bonuses received during the applicable CMI period increases Katz' CMI from $28,175, as reported by Katz, to $35,694.86, thereby raising a presumption of abuse.

In re Katz, 451 B.R. @ 516-517

---

[1]    <u>In re Bernard</u>, 397 B.R. 605, 607 (Bkrtcy. D.Mich. 2008); and <u>In re Robrock</u>, 430 B.R. 197, 204 (Bkrtcy. D.Minn. 2010)

2.      <u>Even under the *Bernard* and *Robrock* standard, income, to be included in the CMI calculation, must be both *received* and *derived during* the applicable six-month period immediately proceeding the filing of bankruptcy.</u>

Assuming, *arguendo*, that this court were to use the standard articulated in *Bernard* and <u>Robrock</u>, *supra*, for calculating Debtor's CMI, would Debtor's applicable commitment period be any different? The answer is "No," and here is why nothing would change.

Debtor reported income from GEMS of $81,628.00 on his 2017 federal income tax return [See page 6 of Garcia-Delgado's declaration [Document #92]. Although Debtor paid income tax calculated on that income, he was only paid $6,000.00 per month (i.e, $72,000.00 in 2017); the difference is $9,268.00 [$81,628.00 as reported on Debtor's 2017 federal income tax return minus his actual income of $72,000.00 = $9,628.00]. That is not a fact that is in dispute. Debtor's wife income is not at issue.

The difference of $9,268.00 represents Debtor's undistributed share (about 11%) of his 2017 GEMS income, based on his 35% ownership interest in GEMS; Debtor left said money in GEMS so that GEMS could cover its current operating expenses. Since Debtor never received said $9,268.00 of undistributed income, the first prong of the CMI income calculation - that the income be received - has not been met.

The second criteria, according to <u>Bernard</u> and <u>Robrock</u>, *supra*, is that the income, if not received during the CMI calculation period, must have been derived during that period - that is, the right to receive the additional income must have been earned during the CMI calculation. As already noted, Debtor has testified that he never, ever received any income in addition to the $6,000.00 per month that he has documented. If he never received any portion of the $9,268.00 in unpaid 2017 profit, then no portion of that income can be "derived" during the CMI calculation period.

In <u>Robrock</u>, *supra*, for example, the debtor in question was a doctor who received part of his income pursuant to a profit-sharing arrangement, based on activity points accrued during each quarter of the year. The part of the debtor's income that was derived from the profit sharing arrangement was paid annually, in the first quarter of the following year, if the clinic earned a profit during the previous year. Thus, in <u>Robrock</u>, the court ruled that the portion of debtor's income that could be traced to debtor's profit sharing activity points had to be added to his CMI calculation, irrespective of when the income was actually received.

It is important to note that the court in <u>Robrock</u>, *supra*, also ruled that the CMI income derived during the CMI calculation period also had to be received at some point [See, <u>Robrock</u>, 430 B.R. @ 204; see, also, <u>In re Bernard</u>, 397 B.R. 605, 607 (Bkrtcy. D. Mass. 2008)].

<u>Robrock</u> and <u>Bernard</u>, *supra*, are entirely distinguishable from the facts in the instant case. As Debtor has consistently testified, he never, ever received any additional income from GEMS separate and apart from the $6,000.00 in regular monthly income he received from GEMS. Debtor was never paid the remaining $9,268.00, which is his undistributed minority share of his 35% interest in GEMS' 2017 profits. If Debtor never received said money, by definition, it cannot be said to have been derived. Additionally, as noted earlier, said undistributed profits, or any portion thereof, cannot be traced to the CMI calculation period (which is June-November, 2017).

Lastly, not only can the undistributed profits, or any portion thereof, not be traced to the CMI calculation period, but there are no facts in the record before this court pointing to when any portion of Debtor's undistributed share of his income from GEMS was derived. Debtor's CMI calculation period is from June 1, 2017 to November 30, 2017. Absent such evidence, which Trinity does not have, Trinity cannot prove that any portion of the $9,268.00 was derived during the applicable CMI calculation period. Hence, said income cannot be used to increase Debtor's CMI income, thus pushing Debtor's applicable commitment period from 36 to 60 months. Thus, Trinity has no factual or legal basis upon which to assert that said $9,268.00 of Debtor's 2017 undistributed GEMS profit was derived during the CMI calculation period.

3.    <u>There is no evidence in the record to support a finding that Debtor's income for the CMI calculation period exceeded the median income for a family of 6 people on the date Debtor commenced his case.</u>

On at least two occasions now, Trinity has quoted the following two paragraphs from Debtor's declaration filed on August 1, 2018 [See Docket #64], which Debtor filed in support of his plan confirmation; Trinity quoted said paragraphs in a failed effort to show that Debtor's undistributed share of GEMS 2017 profit in the amount of $9,268.00 was income derived during the CMI calculation period, and which therefore should be included in Debtor's CMI for the purpose of determining Debtor's minimum commitment period. The quoted testimony is as follows:

12a.    I am paid fixed salary of $2,500.00 per month and a fixed draw of $3,500.00 per month. ***At the end of the year***, we determine whether or not there is net income that is available to distribute to the owners, and if so, how much to distribute.

12b.    ***Moreover, if we distribute all of the net income, we will not have
any reserve cash with which to operate. We always have to allocate
a portion of GEMS' net income to reinvestment in GEMS for
operational needs and unforseen emergencies.***

[See Declaration of Mark Rosenberg, pg. 10, filed on August 1, 2018, as Docket #64].

Debtor is at a loss to understand precisely how either of said paragraphs proves that Debtor's

undistributed share of GEMS 2017 profits was derived during the CMI calculation period. They

prove no such thing.

The first line of paragraph 12a is a factual statement about the amount of Debtor's actual

income in 2017; Debtor repeatedly has testified that he earned income of $6,000.00 per month from

GEMS; the remainder of paragraphs 12a and 12b address the procedure at the end of each

calendar/business year with respect to determining whether or not to distribute any additional GEMS

profits as income to the owners.

There is no testimony or other evidence in the record before this court to suggest that GEMS

distributed any additional 2017 profit to Debtor. In fact, Debtor has repeatedly testified that he

received no additional income from GEMS' at the close of GEMS' 2017 calendar/business year;

he does so again here [See Declaration of Mark Efrem Rosenberg, dated December 5, 2018, stating

that, in 2018, after the close of GEMS' 2017 business/calendar year, Debtor did not receive any

additional distribution of 2017 profit from GEMS. Trinity has no evidence to the contrary, and it

cannot prove that in 2018 Debtor received any additional distribution of 2017 profits from GEMS.

The following are excerpts from Debtor's Declaration filed on November 27, 2018 in support

of his plan confirmation:

"5.    While I reported income from GEMS on my 2017 federal income tax
return in the amount of $81,628.00 - on which I paid income tax - my
gross take home income never exceeded the $72,000.00 (i.e.,the
$6,000.00 in salary and owner's draw that I received on a monthly
basis) that I reported in my schedules.

6.    The difference of $9,628.00 represents the amount of my unrealized
share of GEMS' 2017 profits; said income was unrealized because I
left that portion of my distributive share of GEMS' profit in the
business for operational purposes.

7.    At no time in 2015, 2016, or 2017 did I ever receive any additional
ownership draw over and above my stated salary (including monthly
ownership draw); in 2017 and 2018 year to date, my monthly income,
including my owner's draw, was $6,000.00 per month."

[See Declaration of Mark Rosenberg, pg. 6 filed on November 27, 2018, as Docket #92].

The following are excerpts from Debtor's Declaration filed on August 1, 2018 in support of his plan confirmation:

> "11d.   My current monthly draw is $3,500.00, and my total income, including salary, is $6,000.00 per month.
>  . . . .
>
> 13.   I have complied with the means test. I am a salaried employee of GEMS. I also receive a draw against my share of the profits. I used my gross income (salary and draw) to determine my minimum commitment period."

[See Declaration of Mark Rosenberg, pgs. 8, 10, filed on August 1, 2018, as Docket #64].

Debtor received only $6,000.00 per month (annualized and actual income of $72,000.00 per year from GEMS), plus his wife's monthly income. Together, their income during the CMI calcula-tion period, as annualized, totaled only $101,300.28, which was less than the median income for a family of 6 people, which was $106,244.00. Income not received, by definition, cannot be derived; moreover, there is no proof as to whether the undistributed GEMS profit was derived during the CMI calculation period, if ever. Thus, no matter how it is calculated, Debtor's actual income, and/or his actual and derived annualized income during the CMI calculation period, was below the median income for a family of six. Thus, Debtor is entitled to a minimum commitment period of 36 months.

4.    <u>The Weigand case is not applicable to the determination of Debtor's CMI.
Rather, the Ramsey case is the more appropriate and on-point decision.</u>

Trinity cites <u>In re Weigand</u>, 386 B.R. 238 (9th Cir. BAP 2008) for the proposition that a debtor's gross income derived during the CMI calculation period, without regard to whether said income is taxable, must be used to determine a debtor's CMI. A number of other courts have chosen to disregard <u>Weigand</u>. However, the Weigand methodology for calculating a debtor's CMI is not properly at issue in the instant case, because Debtor was paid as an employee of GEMS, and not as an unincorporated business owner.

In <u>Weigand</u>, *supra*, the debtor operated a business as a sole proprietor. He deducted normal business expenses needed to operate his business, and reported the adjusted gross income (i.e., income minus business expenses) as his income for purposes of determining the applicable commitment period. The BAP concluded that the gross income, before the deduction of legitimate business expenses, had to be used in determining the applicable commitment period.

1    The instant case is different from <u>Weigand</u> because Debtor is not operating any business as

2    a sole proprietor. While he is a minority business owner of GEMS, Debtor also is an employee of

3    GEMS, and he is paid as an employee of GEMS. He is paid a regular salary and draw against his

4    share of profits. That income, totaling $72,000.00 annually, is Debtor's entire reported income from

5    GEMS. That is what he correctly reported on Form 122C-1, together with his wife's income.

6    The appropriate and applicable case is <u>In re Ramsey</u>, Case No. 10-55255 (Bkrtcy. E.D. Mich.,

7    Oct. 4, 2011); a copy of said decision is attached hereto and incorporated herein as consecutively

8    numbered Exhibit #6. Ramsey involved an attorney who was the sole owner of her professional law

9    corporation. Debtor deducted her professional law corporation's business deductions, and reported

10    the adjusted gross corporate income as her gross pass-through income on her individual income tax

11    return. The bankruptcy court acknowledged <u>Weigand</u>'s holding, but overruled the trustee's ob-

12    jection, ruling that the debtor and her law corporation were separate legal entities. <u>Ramsey</u> controls

13    the method of calculation of the Debtor's income in this case for the purpose of determining the

14    applicable commitment period, which is 36 months. There is no evidence or appropriate legal theory

15    that points to any other conclusion. Moreover, as previously noted, the Chapter 13 Trustee will be

16    withdrawing her objection to the confirmation of Debtor's Second Amended Chapter 13 Plan.

17

18    CONCLUSION

19    Pursuant to Judge Donovan's published decision in <u>Katz</u>, *supra*, only the income that a

20    debtor actually earns and receives during the CMI calculation period (i.e., the six months immediate-

21    ly preceding the filing of bankruptcy) is used for the purposes of calculating the applicable commit-

22    ment period pursuant to 11 U.S.C. §101(10A)(A)(I).

23    However, even if income derived but unpaid during the CMI calculation period were to be

24    used to determine the applicable commitment period, the $9,268.00 of Debtor's undistributed GEMS

25    profits for 2017 cannot be counted as income because a) it was never distributed to Debtor, and

26    b) no portion of said income can be traced to the applicable commitment calculation period, and

27    c) there is no evidence before this court that traces, or that can trace, any portion of Debtor's undis-

28    tributed GEMS income in the amount of $9,268.00 to the applicable commitment calculation period.

1   The excerpts of Debtor's 2017 tax return provided by Trinity are insufficient to disprove

2   Debtor's entitlement to a 36-month commitment period; said tax return shows only Debtor's total

3   income, but it does not show from which quarter or period any specific amount of income was

4   derived. Debtor has provided evidence to the Chapter 13 Trustee in the form of his GEMS pay stubs

5   sufficient to prove that Debtor earned only $6,000.00 per month from GEMS during the CMI

6   calculation period.

7   Moreover, Debtor repeatedly has testified that he only received $6,000.00 per month from

8   GEMS during the CMI calculation period [i.e., annualized CMI income of $72,000.00 from GEMS];

9   Trinity cannot disprove said evidence, and it has no contrary evidence of its own. It should be noted

10  that the Trustee no longer disputes the calculation of Debtor's CMI income, or that Debtor is entitled

11  to a 36-month commitment period. Trustee is supporting the confirmation of Debtor's currently

12  proposed Second Amended Plan.

13  While Debtor paid income taxes on the entire income of $81,628.00 that he reported on his

14  2017 federal income tax return, Debtor's actual income never exceeded the $72,000.00 (i.e., the

15  $6,000.00 in salary and owner's draw that he received on a monthly basis) that he reported and

16  disclosed in his income Schedule "I" and on Form 122C-1. Debtor's applicable commitment period

17  is 36-months.

18  **WHEREFORE**, Debtor prays that this court deny Trinity's objection to the confirmation

19  of Debtor's Second Amended Plan, and that it confirm Debtor's Second Amended Plan as proposed.

20  Dated: December 5, 2018

21

22  _____
    Richard Mark Garber, Attorney for Debtor

23

24

25

26

27

28

## DECLARATION OF MARK EFREM ROSENBERG

I, Mark Efrem Rosenberg, declare:

1.      I am the debtor in the above-titled case, which I filed on December 29, 2017. Based on the date I commenced this case, my 6-month CMI calculation period started on June 1, 2017 and terminated on November 30, 2017.

2.      I have personal knowledge of the facts to which I have testified.

3.      GEMS is a corporation. I am paid as an employee of GEMS, not as an unincorporated business owner. At all times during 2017 and 2018, my income from GEMS was $6,000.00 per month.

4.      Of that monthly income, $2,500.00 was designated as salary, and $3,500.00 was designated as an ownership draw. In 2017, I reported income from GEMS of $81,628.00; that income included both salary and my owner's draw. That figure included my entire 35% distributive share of the net profits of GEMS.

5.      The difference between my actual 2017 income from GEMS and my reported income from GEMS on my 2017 federal income tax return was $9,268.00, and represents my undistributed income in 2017 from GEMS' 2017 corporate profits.

6.      My brother, the 65% owner of GEMS, left a proportional share of his undistributed 2017 ownership income in GEMS.

7.      We did this so that GEMS would have sufficient operating income to start the 2018 business/calendar year. The first quarter is always our slowest season.

8.      The $9,268.00, constituting my share of 2017 GEMS' profit that I left in GEMS as operating capital, amounted only to 11% of GEMS' total 2017 corporate profit.

9.      At no time in 2015, 2016, 2017, or 2018, did I ever receive any additional income or ownership distribution from GEMS over and above my stated salary (including my monthly ownership draw); in 2017 and 2018 year to date, I never received more than my salary and owner's draw of $6,000.00 per month.

10.      The $9,268.00 that I left in GEMS as my undistributed share of GEMS 2017 annual corporate profit cannot be traced to any specific quarter. There is no way to determine that said $9,268.00 in undistributed profit was earned in, or derived from, the CMI calculation commitment period from June 1, 2017 to November 30, 2017.

1    I declare under penalty of perjury of the laws of the State of California that the foregoing

2    is true and correct and within my personal knowledge. Executed this December 5, 2018, in Valley

3    Village (North Hollywood), CA.

4

5                                                    Mark Efrem Rosenberg, Declarant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**In re: Paula R. Ramsey, Debtor.**

**Case No. 10-55255**

**UNITED STATES BANKRUPTCY
COURT EASTERN DISTRICT OF
MICHIGAN SOUTHERN DIVISION**

**Signed on October 04, 2011**

Header ends here.

Hon. Walter Shapero

## OPINION REGARDING APPLICABLE COMMITMENT PERIOD

The matter before the Court is the Trustee's Objection to Confirmation. The Trustee argues that the Debtor's deductions on Line 3b of Form 22C are improper under 11 U.S.C. § 1325(b)(2)(B), and that Debtor is not entitled to confirmation of a plan that runs less than 60 months pursuant to 11 U.S.C. § 1325(b)(4).

## I. BACKGROUND

Paula Ramsey ("Debtor") filed her Chapter 13 petition on May 7, 2010. Debtor is an attorney and the sole owner of the Law Office of Paula R. Ramsey PLLC ("Law Office). Debtor's sole source of personal income is the monthly net income of the Law Office.

On May 7, 2010, Debtor filed a proposed Chapter 13 plan proposing a three year duration, her "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" ("Form 22C"), and her remaining Schedules.

On Part I, Section 3 of her Form 22C, entitled "Calculation of § 1325(b)(4) Commitment Period," Debtor listed average monthly gross receipts of the Law Office in the amount of $5,212.92 and deducted the Law Office's average monthly business expenses in the amount of $2,971.33,

calculating the Law Office's average monthly net income to be $2,241.59. Line 15 of Debtor's Form 22C lists an annualized current monthly income of $26,899.08, which is less than the applicable median family income

Page 2

for the State of Michigan ($43,456.00 for a household of one). Based on this calculation, Debtor's proposed a 36-month plan with a 1% dividend to unsecured creditors.

Debtor filed a First Amended Chapter 13 plan on May 27, 2010 and filed a Second Amended Chapter 13 Plan on June 7, 2010, both proposing 36-month plans. On July 2, 2010, the Trustee filed an Objection to Confirmation of Debtor's plan, specifically objecting to the Debtor's deduction of business expenses on Line 3b of Form 22C as being contrary to 11 U.S.C. § 1325(b)(2)(B) and asserting that a 60-month plan length is required. The Trustee contends that Form 22C is inconsistent with the Bankruptcy Code in that the business expense deduction of Line 3(b) should not be made to determine a debtor's "current monthly income," but rather that the business expenses should be deducted with the Debtor's other expenses in calculating her "projected disposable income." The Trustee argues that a 60-month plan would yield $9,458, which would equal a 4% dividend to unsecured creditors.

At an adjourned confirmation hearing held on August 25, 2010, the Court heard oral argument regarding the issue of the business expense deduction on Form 22C. On September 9, 2010, Debtor filed an Amended Form 22C, listing "income from PLLC" in the amount of $2,241.59 on Line 9, which accounts for "[i]ncome from all other sources," and eliminating any reference to the business income on Line 3. The Trustee argues that this amendment does not impact the underlying matter at issue in the Trustee's Objection.



-1-

Exhibit # 6

Despite this outstanding issue, the Debtor's plan was confirmed by consent on December 15, 2010. The Order Confirming Plan provided: "Debtor's plan shall be extended to 60 months at the time of confirmation. Contingent on the court ruling in favor of the debtor with respect to trustee objection #1 the plan shall be reduced back to a 36 month plan by stipulation between the debtor and the trustee."

## II. DISCUSSION

The issue before the Court is whether, when calculating the applicable commitment period, a chapter 13 debtor's business expenses may be deducted when calculating "current monthly income," as indicated on Form 22C[1], or whether they must

Page 3

be deducted from current monthly income to calculate the debtor's "projected disposable income."

11 U.S.C. § 101(10A) defines "current monthly income" as "the average monthly income from all sources that the debtor receives ... without regard to whether such income is taxable income, derived during the 6-month period [before bankruptcy]." 11 U.S.C. §1325(b)(2) defines disposable income:

> For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended . . . (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and . . . (B) if the debtor is engaged in business, for the payment of expenditures necessary for the

continuation, preservation, and operation of such business.

Most of the courts that have decided this issue have found that Form 22C is inconsistent with the Code. The Trustee relies on *Wiegand, Arnold, Bembenek,* and *Sharp* and asserts that Form 22C is inconsistent with the Code to the extent that it provides for a deduction of business expenses when calculating "current monthly income." The Debtor relies on *Geiger* and asserts that, since she only "receives" the net income of her law office as her own personal income and she does not "receive" the gross receipts of the law firm, the law firm's net income (after deducting ordinary and necessary business expenses) is the appropriate figure to be used in calculating "current monthly income."

In *In re Wiegand,* 386 B.R. 238 (9th Cir. BAP 2008), the 9th Circuit Bankruptcy Appellate Panel ("BAP") found that Form 22C was directly at odds with § 1325(b)(2)(B) and held that debtors must follow the Code, not Form 22C. In that case, the debtors were a trucker and his spouse. The debtors' Form 22C listed gross receipts from his trucking business of $6,192 and a deduction of ordinary and necessary business expenses of $5,175, reflecting a net monthly business income of $1,382. Based on that calculation, the debtors were determined to be below-median income debtors and they determined that the three-year applicable commitment period applied. They then filed a 36-month plan that proposed monthly payments of $298. The trustee objected to confirmation of their plan on the grounds that the debtors incorrectly calculated their current monthly

Page 4

income. The bankruptcy court overruled the objections and the BAP reversed. The BAP found that § 1325(b)(2) was "plain and unambiguous" and it ultimately held that "the specificity of § 1325(b)(2)(B) controls - business deductions are to be taken from a



debtor's current monthly income to arrive at the debtor's disposable income." *Id.* at 242. The BAP stated that "[i]f business expenses are deducted from gross receipts to determine a chapter 13 debtor's current monthly income, then there would be no need for § 1325(b)(2)(B), which provides for the same deductions." *Id.* The BAP also noted that using net business income to determine a debtor's currently monthly income might result in chapter 13 debtors using the deductions twice: once in calculating their current monthly income, and again in calculating their disposable income.[2]

Other courts considering this issue have come to the same conclusion. *See In re Arnold*, 376 B.R. 652 (Bankr. M.D. Tenn. 2007) (holding that "[o]fficial Form 22C, Part I, Line 3, which permits the deduction of business expenses to determine 'current income' is simply wrong"); *In re Bembenek*, 2008 WL 2704289; *In re Sharp*, 394 B.R. 207 (Bankr. C.D. Ill. 2008) (holding that "in calculating current monthly income, a self-employed debtor must use gross business income and may not deduct business expenses in the calculation).

The only case cited by the Debtor was *In re Geiger*, 2010 WL 2756760 (Bankr. N.D. Ohio 2010). In that case, the debtor was the sole shareholder of a trucking company that was organized under Ohio law as an S corporation. The debtor in that case filed corporate tax returns for the S corporation, but followed virtually no other corporate formalities. In calculating his current monthly income in that case, the debtor took the average of the corporation's gross receipts for the six months prior to filing and deducted business expenses, reflecting a net monthly income of $3,883. Based on that calculation, the debtor was considered to be a below-median income debtor and he determined that the three-year applicable commitment period applied. The trustee objected, arguing that the debtor was required to commit to a 60-month plan. The court, focusing on the

definition of current monthly income as being "the average monthly income from all sources that the debtor *receives*" (emphasis added), stated that "there is a strong textual

Page 5

argument that the gross receipts are not income to debtor because he does not receive them because the income belongs to Corporation. Debtor 'receives' only the net income or profit, the flow-through from the S Corporation." Id. at 9. The court distinguished the facts in that case from those in *Weigand*, noting that unlike *Weigand*, the debtor was operating his business through a corporate form that remained intact and the debtor's only income was the flow-through of the net income from the S corporation. That court ultimately found "no error in [d]ebtor's use of the flow-through income from [the] Corporation, and not gross receipts, on the means test."

In this case, the Court agrees with the approach taken in the *Geiger* case. In this case, there have not been asserted or proven facts which indicate that Debtor's law firm is not a separate corporate entity. It follows that what is available for her to receive is the net income of the law firm. The term "receives" is not defined in the Bankruptcy Code, but it is commonly defined as: "to come into possession of." To hold that the Debtor in this case received, or came into possession of, all of the gross income from her law firm, which is a separate entity and remained intact, does not make any more sense than it would to hold so if the entity involved was a manufacturer engaged in a business other than a personal services business, absent facts requiring one to ignore the entity's separateness. The operating costs and expenses of the law firm must be paid, and thus the gross receipts of the law firm cannot be considered to be available to her. Debtor only "received" the net income of the law firm, or at least that is what is realistically available for her to receive, thus, the

business's expenses were properly deducted when determining Debtor's current monthly income.

Supporting this decision is the fact that the Census Bureau uses net, rather than gross, income in computing median family incomes. Under 11 U.S.C. § 1325(b), those are the figures to which a debtor's annualized current monthly income is compared; therefore, it makes sense to calculate "current monthly income" in this same way. Also, plain meaning interpretation of § 1325(b)(3) and § 707(b)(2)(A) and (B) would result in a self-employed, above-median-income debtor never being able to deduct most business expenses. Section 1325(b)(3) requires an above-median-income debtor to determine "amounts reasonably necessary to be expended" according to "subparagraphs (A) and (B) of section 707(b)(2)." Those paragraphs of the means test require that "[t]he debtor's

Page 6

monthly expenses [ ] be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides. . . ." All of the relevant IRS standards and categories relate to personal and household expenses, not business expenses (which are included in another section of the IRS Financial Analysis Handbook). Likewise, all of the "Other Necessary Expenses" expressly allowed to be deducted under § 707(b)(2)(A) and (B) are personal and household expenses, not business expenses. Thus, the only sensible interpretation is that a self-employed debtor's income is net, not gross, income.

This Court understands that using net business income to determine a debtor's current monthly income creates a redundancy

with § 1325(b)(2)(B), which instructs a debtor to subtract business expenses from current monthly income to calculate the debtor's disposable income.[3] As noted, this problem for above-median-income debtors was corrected in Form 22C because the form instructs debtors not to deduct those expenses a second time. Furthermore, if a debtor attempts to take such a "double deduction," the Chapter 13 Trustee would able to raise the proper objection to such.

### III. CONCLUSION

For the foregoing reasons, Trustee's Objection to Confirmation of Debtor's Plan is denied. Debtor's Plan is thus entitled to be a 36-month plan. Debtor shall prepare and present an appropriate order.

**Walter                    Shapero
United States Bankruptcy Judge**

--------

Notes:

[1] Part I of Form 22C requires a debtor to calculate his or her current monthly income by subtracting business expenses from gross receipts. The Trustee argues that this section of Form 22C is inconsistent with the Code, specifically § 1325(b)(2).

[2] Official Form 22C addresses this problem by instructing debtors not to deduct any business expenses that they have already deducted to calculate business income on Line 3 of the form.

[3] Section 1325(b)(2)(B) existed prior to the changes introduced by BAPCPA and was likely overlooked by Congress when it introduced the means test and the concept of "current monthly income."

--------



14

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

    12652 Huston Street, North Hollywood, CA 91607

A true and correct copy of the foregoing document entitled (*specify*): _____
SUR-REPLY OF M. ROSENBERG _____
TOTHE RESPONSE OF TRINITY FINANCIAL SERVICES IN SUPPORT _____
OF ITS OBJECTION TO DEBTOR'S SECOND AMENDED PLAN _____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>12/05/2018</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

    ☑ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) <u>12/06/2018</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Victoria Kaufman, U.S. Bankruptcy Judge, 21041 Burbank Blvd., Suite 354, Woodland Hills, CA 91367

Mark Efrem Rosenberg, Debtor, 12731 Hatteras St., Valley Village, CA 91607

    ☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

    ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/05/2018 | Keti Bicon | *Keti Bicon* |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

# Mailing Information for Case 1:17-bk-13413-VK

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Richard Mark Garber**    rickgarber@sbcglobal.net, garberrr82127@notify.bestcase.com
- **Rafael R Garcia-Salgado**    rgarcia@bwslaw.com, bantle@bwslaw.com,rjr-nef@bwslaw.com,jgomez@bwslaw.com
- **Christina J O**    christinao@mclaw.org, CACD_ECF@mclaw.org
- **Richard J Reynolds**    rreynolds@bwslaw.com, psoeffner@bwslaw.com,tmims@bwslaw.com,rjr-nef@bwslaw.com;fcabezas@bwslaw.com
- **Elizabeth (SV) F Rojas (TR)**    cacb_ecf_sv@ch13wla.com
- **Gabor Szabo**    smdulaw@sbcglobal.net
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov

## Manual Notice List

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

    **JPMORGAN CHASE BANK, N.A.**

    ,

## <u>Creditor List</u>

Click the link above to produce a complete list of **creditors** only.

## <u>List of Creditors</u>

Click on the link above to produce a list of **all** creditors and **all** parties in the case. User may sort in columns or raw data format.